## WALKER v. TERRELL, Comptroller.
(No. 7616.)

(Court of Civil Appeals of Texas. Dallas. June 24, 1916. Rehearing Denied Nov. 4, 1916.)

1. INTOXICATING LIQUORS &145—VIOLATION OF CLOSING LAW—"KEPT OPEN AND BUSINESS CONDUCTED THEREIN."

A party operating a saloon, café, and cabaret, the waiters in the cabaret receiving money from the customers for drinks, which they purchased in the saloon, who permitted customers to remain in the cabaret, after the legal closing hour for the saloon of 9:30 p. m., to drink what they had purchased prior to the closing hour, pursuant to warnings from the waiters, to eat their lunches, and to drift out gradually, servants, waiters, and manager remaining in the cabaret to gather up empty bottles and clean up, and to deliver, after 9:30, liquors purchased in the saloon before that hour, customers being entertained by music and lewd women, was guilty of violating Vernon's Sayles' Ann. Civ. St. 1914, art. 7442, establishing the closing hour of 9:30 p. m. for every person having a liquor license, since the language of the statute, "was kept open and business conducted therein," does not mean merely the act of selling liquors; its meaning extending to each act of a liquor dealer or his representative done in connection with or incident to such sale.

[Ed. Note.—For other cases, see Intoxicating Liquors, Cent. Dig. §§ 156–158; Dec. Dig. &145.]

2. INTOXICATING LIQUORS &145 — CLOSING LAW—STATUTE—"HOUSE OR PLACE WHERE BUSINESS OF SELLING LIQUORS IS CONDUCTED."

A cabaret or rathskeller, operated in connection with an adjacent bar where drinks were purchased by the waiters for the customers, was a part of the saloon business, the ownership of the whole being in the hands of a partnership, within Vernon's Sayles' Ann. Civ. St. 1914, art. 7451, establishing a closing hour of 9:30 p. m. for any "house or place where the business of selling liquors under license is conducted," the statute meaning any and all places, whether immediately connected with the barroom or detached therefrom, over which the seller of liquors has the right to and does exercise authority and control, and which are used in connection with or incident to the business of selling liquors.

[Ed. Note.—For other cases, see Intoxicating Liquors, Cent. Dig. §§ 156–158; Dec. Dig. &145.]

3. TIME &14—CLOSING LAW—STANDARD OR ACTUAL TIME.

Vernon's Sayles' Ann. Civ. St. 1914, art. 7451, establishing a closing hour of 9:30 p. m. for places selling intoxicating liquors, refers to actual or sun time, and not to standard or railroad time.

[Ed. Note.—For other cases, see Time, Cent. Dig. § 55; Dec. Dig. &14.]

4. EVIDENCE &17 — JUDICIAL NOTICE — STANDARD AND ACTUAL TIME.

The court will take judicial cognizance of the fact that standard or railroad time at Dallas, Tex., is the actual or sun time along the ninetieth degree of longitude west from Greenwich, that Dallas is approximately on longitude 96° 51' 30" west from Greenwich, and that there is a difference of four minutes in time for every degree of longitude.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 21; Dec. Dig. &17.]

5. APPEAL AND ERROR &170(1)—QUESTION REVIEWABLE—QUESTION OF LAW NOT RAISED BY PLEADINGS.

In an action against the comptroller of public accounts to reinstate a liquor dealer's license, rescinded for an alleged violation of the 9:30 p. m. closing law, where plaintiff, in his petition, denied that his place of business was kept open after 9:30 p. m., the character or kind of time, whether standard or actual, which controlled, being a question of law, whether or not the question was raised by the pleadings below, the ruling was subject to review in the Court of Civil Appeals.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 1035; Dec. Dig. &170(1).]

Appeal from District Court, Dallas County; T. A. Work, Judge.

Suit by J. O. Walker against H. B. Terrell, Comptroller of Public Accounts. From a judgment for defendant, plaintiff appeals. Judgment reversed, and cause remanded for new trial.

Cecil L. Simpson, of Dallas, for appellant. R. B. Humphrey, of Throckmorton, for appellee.

TALBOT, J. This suit was instituted in the district court of Dallas county, Tex., July 15, 1915, against H. B. Terrell, in his official capacity of comptroller of public accounts of the state of Texas, to reinstate a liquor dealer's license theretofore granted appellant by appellee on a permit dated September 19, 1914, and which liquor dealer's license was rescinded by appellee by an order dated June 22, 1915, for an alleged violation, on May 15, 1915, of what is known as the 9:30 p. m. closing law of this state. There is no controversy over the pleadings. The appellant alleged the granting of the license to him about the 21st day of October, 1914, to do business as a retail liquor dealer for a period of years, and the revocation of said license by appellee on June 22, 1915. He denied that he had violated the 9:30 closing statute, and prayed that his license be reinstated. The case was tried before the court without the aid of a jury, and judgment was rendered upholding the order made by the appellee rescinding appellant's said

liquor dealer's license, and denying the relief sought. From this judgment, the appellant appealed.

Article 7451 of Vernon's Sayles' Texas Civil Statutes is as follows:

"Every person or firm having a license under the provisions of this law (meaning the liquor dealer's law), who may be engaged in or who may hereafter engage in the sale of intoxicating liquors to be drunk on the premises in any locality of this state, other than where local option is in force, shall close and keep closed their houses and places of business and transact no business *herein* (meaning no doubt *therein*) or therefrom from and after 9:30 o'clock p. m. on Saturday and between that hour and 6:00 o'clock a. m. on the following Monday of any week; or between the hours of 9:30 p. m. and 6:00 a. m. of the following morning of any week day, and shall close and keep closed their houses and places of business and transact no business therein or therefrom from and after 9:30 p. m. Saturday until 6:00 a. m. of the following Monday of each week; and between the hours of 9:30 p. m. and 6:00 a. m. of any week day."

Other articles of said statute provide the procedure for ascertaining whether or not any person to whom a retail liquor dealer's license has been issued has violated any of the conditions and provisions set out in the application filed with the comptroller for a permit to apply for such license, and article 7442 is to the effect that, if the comptroller shall determine from the preponderance of the credible evidence obtained that at any time after the issuance of the license to the liquor dealer the place where the business of selling liquors under said license was conducted was kept open and business conducted therein after 9:30 p. m. and between that hour and 6 a. m. the following morning, he shall rescind, vacate, and withdraw said license.

The trial court filed in this case conclusions of law and fact, the material facts being as follows:

"The facts in this case shows that the license in question was obtained for 1618 Main street. Connected with 1618 Main street was the number 1614½ Main street. This was an entrance that led down into a rathskeller, in other words, a cellar where people were furnished with all character of edibles and drinks according to the taste of the individual. On the other side of 1618 Main street was a café or cabaret, with also an entrance on Main street. The entrance into the café led you into the cabaret. There was a back or side door that led from the café or cabaret into a rathskeller or cellar; both the rathskeller or cellar and the cabaret had communication with and through the back door of the saloon. On this particular occasion at the time and place mentioned, and prior thereto, Johnnie Senchal and Walker, appellant, were partners in the conduct of this business, and this business included the bar, the rathskeller, and the cabaret, all with free access to and through the back door of the saloon, which was a part of the same building and the same business. Walker, the plaintiff herein, presided over and had conduct of the saloon, Senchal presided over the two eating places, the cabaret and cellar. They were partners enjoying mutually the proceeds and profits of the saloon, cabaret, and cellar. On this particular occasion at the time and place when the officers, Roddy and Irving, entered the rathskeller at 9:45 (this time 9:45 was

time used in Dallas, standard time kept by Linz Bros.), it was in full swing. A man was playing a piano, and there is some question as to whether a woman was playing a violin. There were in the neighborhood of 75 people in the cellar; among whom were probably a dozen women, known characters of bad repute. On the tables all over the room or cellar were empty and half empty beer bottles and glasses; some of the beer had been all consumed out of some of the bottles, and in other bottles half consumed, and on one table five or six bottles of beer that had not been touched, but was ready for use. While the officers were present one of the waiters went in the back part of the house and brought 12 or 15 packages of beer or drinks of some character and laid them on a table near the front door. There is no dispute as to the door of the saloon being locked. The testimony is that it was locked. No liquor was sold after 9:30 o'clock, all the liquor had been sold before 9:30 o'clock and put in cellar. The court finds and holds from this state of facts that the plain, obvious, palpable, and unmistakable meaning of the 9:30 closing law was openly, flagrantly, and notoriously and knowingly violated, and that the building as so arranged, the rathskeller and cabaret running as they were run, was an unmistakable subterfuge and disguise."

The first assignment of error is, in substance, that the court's conclusions of fact, to the effect that No. 1618 Main street was connected with No. 1614½ Main street and that the saloon of appellant located at 1618 Main street was being operated after 9:30 p. m. May 15, 1915, in connection with the cabaret and café of appellant, is not supported by the evidence; that the undisputed evidence shows that all entrances to the saloon and café were entirely closed, and no business was conducted therein after 9:30 p. m. of that date. The proposition advanced under this assignment is that if No. 1618 Main street, Dallas, Tex., the place where appellant was permitted under his license to do business as a retail liquor dealer, was closed after 9:30 p. m. of May 15, 1915, and before 6 o'clock a. m. of the following day, and no business was being conducted therein or therefrom after 9:30 p. m. of May 15, 1915, and before 6 a. m. of the following, day, appellant's license was illegally rescinded. In reply to the foregoing assignment and proposition of the appellant, the appellee asserts that the conclusions of the trial court that the cabaret located at No. 1614½ Main street was a part of the place designated in appellant's license as No. 1618 Main street, and that the house or place where liquors were sold under said license was kept open and business conducted therein after 9:30 p. m. May 15, 1915, is abundantly supported by the testimony; that the "expression used in the statute, 'house or place where the business of selling liquors under said license was conducted,' does not mean simply the room in which the bar is situated. Its meaning includes any and all places, whether immediately connected with said barroom or detached therefrom, over which the seller of liquor has the right and does exercise authority and control, and which are used in connection with, or incident to, the business of selling liquors."

The decision of the questions raised turns upon the following testimony:

The appellant Walker testified:

"I made application to the comptroller and was granted by said comptroller a permit on September 19, 1914, to apply for a liquor dealer's license; I applied for said liquor dealer's license and received same on the 21st day of October, 1914, to do business at 1618 Main street. The license was granted to J. O. Walker. Johnnie Senchal and I were partners in that place. The café is on the other side, a different room. The ground floor of 1618 Main street is about 24 or 26 feet front, and about 90 feet deep. The café and bar constituted the whole of 1618 Main street where I conducted business. During the time that I operated under that license I did not at any time keep open house or do any business at 1618 Main street after 9:30 o'clock. I always closed my door, locked up, got my money out, and was outside by 9:30 o'clock p. m. On May 15, 1915, the date they charge me with violating the 9:30 closing law, my place was closed at 9:25 p. m. The bar and café both were closed. There was no one in the bar at all after 9:30 that night, nor was there any business transacted in there after that time. I had charge of the bar at that time. Senchal was not in control of the bar at 1618 Main street at that time; I was in control of it. I acted for the firm in the management of the café. The café was next door to the saloon. There was a cabaret in another building; it was not in 1618 Main street at all. During the hours between 6 o'clock a. m. and 9:30 o'clock p. m. they came up from the cabaret and bought drinks from me, and paid for them at the bar, and the drinks were delivered in the cabaret. Mr. Senchal and I shared in the profits from those drinks because we were partners in the bar; we sold it at the bar. There was a door from the cabaret into the café upstairs, and you can go from the café into the barroom. Drinks were served at the bar, and drinks were also sold and paid for at the bar, to be consumed in the café and cabaret. I was there on the night the arrest was made by the officers. I was not in the cabaret, but was up on the street talking to some parties after I had closed up, and afterwards I went down in there. The arrest was made after the saloon had been locked and closed; they arrested Mr. Senchal. When I went down in the cabaret after the arrest there was no one in there except the waiters, Mr. Senchal and the two officers. I suppose I was in there five or ten minutes. I was in both the café and cabaret. I don't know just what time I went into the cabaret and café. It was after 9:30 when I left the cabaret that night. I was only down there once after I closed the saloon. No. 1618 Main street is the place where I did business. The rathskeller or cabaret was at No. 1614½ Main street, in the Angus Building. That was not connected with the bar, but you could go from that into the other restaurant, and from that into the bar. Any one that wanted anything to drink in either eating place could get it by sending the waiter with the money and paying for it at the bar, and the waiter could take it to either of the eating places. I did not sell or send down into the café or rathskeller any beer or liquors of any kind after 9:25 o'clock that night; 9:25 was the last thing that was sold. The rathskeller was open at that time. I suppose the waiters that bought and paid for the beer before 9:25 took it down into the rathskeller. If any liquors were served in the rathskeller after I closed up it was liquors that were bought and paid for before 9:25 o'clock."

Johnnie Senchal, appellant's partner in the business, testified in part:

"The 9:30 closing law was never violated from the time Senchal's place was opened until the

day it was closed. The bar was closed each and every night at 9:25 p. m. I put my whole time working at the business, and Mr. Walker put in all of his time. The business consisted of a saloon, café, and rathskeller. The saloon was at 1618 Main street, and the café was next door west, and then beyond that was the rathskeller, which was 1614½ Main street. It is a fact that no liquor was ever sold, and no money ever received, except at the bar. There was never any beer or whisky sold in the rathskeller. In other words, the customer gave the waiter the money, and money was paid at the bar. The bar is about 50 feet from the entrance to the rathskeller. We did not sell liquor in the rathskeller. The waiters acted as agents of the customers. We didn't put any of the customers out of the place (the cabaret) at 9:30; we allowed them to stay there and eat their lunches and drink their drinks, and drift out gradually. We left the place that night to go to the city hall at 10 o'clock. The last parties to leave were two gentlemen sitting at a table drinking beer, and I told them I was sorry to disturb them, but I would have to ask them to leave so that I could go to the city hall with Mr. Roddy and Mr. Irving."

The witness Roddy testified, among other things, as follows:

"I am a member of the police force of the city of Dallas; you go down in the basement, and there is a little stairway that goes back of the basement up into the saloon; it is connected, the saloon and cabaret, by doors and passages. We got to that place at 9:45 p. m. We went into the basement. I guess there were 50 or 75 people in there drinking beer, bottle beer, around the tables in the basement. After we got in there I saw one waiter come with two or three packages and lay them on a table where two or three men were sitting drinking. When we first went in there was 50 or 100 bottles of beer in there, some half drunk, and some looked as if the cork had just been pulled."

E. J. Irving testified:

"I live in the city of Dallas and am on the police force of this city. The cabaret does not connect with the saloon in front, but is connected in the rear by stairway. We went into the cabaret at 9:45 o'clock p. m. and arrested Mr. Senchal. I know it was 9:45, because I had gone down and compared my timepiece with the time in Linz's window, and set my watch exactly right. The first time I went in there was 8:15, and I went out; and this time I went in there at 9:45, and there was between 50 and 75 people in there, and I expect there was nearly 50 people drinking at the time I went in there. Some of the employés of the house were gathering up empty bottles, and some taking dishes away and carrying them to the back. One man delivered three packages of beer on a table; that was one of the waiters. There were 4 bottles of beer in one package, and a half dozen bottles each in the other two packages. That beer was delivered to three different men. They got that beer off of a long table in the rear of the cabaret. I did not see any money change hands, and heard no discussion about the purchase of any beer or drinks of any kind. There were several bundles on the table where they got those packages, and people picked them up and carried them out. There were women and men sitting around the tables drinking. There was a man at the piano playing the piano. Music was going on as we went in. We saw liquors being drunk there, and we arrested him."

The appellee admits there is no evidence whatever of any sale of liquor after 9:25 o'clock on the evening in question. The acts and things relied on to bring the case with-

in the meaning of the statute and to show a violation thereof are summarized as follows:

"First. Allowing customers to remain in the cabaret after 9:30.

"Second. Servants, waiters, and manager remaining in the cabaret after 9:30 to gather up empty bottles, carry away dirty dishes, and otherwise clean up the premises.

"Third. Allowing customers to sit at tables and drink beer or eat food, after 9:30, purchased before that time.

"Fourth. Delivery by waiters or servants in the cabaret after 9:30 of liquors purchased in the saloon before that time.

"Fifth. Entertaining customers with music and the presence of lewd women in the cabaret after 9:30; such things being forbidden in a saloon at any time."

[1] If the acts and things set forth in each of the foregoing paragraphs do not bring the case within the meaning of the statute that the house or place "was kept open and business conducted therein," then considered collectively or as a whole they do. As contended by appellee, the language of article 7442, namely, "was kept open and business conducted therein," does not mean merely the act of selling liquors. Its meaning extends to and includes each and every act of the liquor dealer or his representatives done in connection with, or incident to, such sale. The evidence is amply sufficient to show that at the time the officers went into the cabaret and arrested Senchal, many of appellant's customers were in the cabaret; that the manager of the cabaret and the servants and waiters of appellant were therein to wait upon customers, to gather up empty bottles, carry away dirty dishes, and otherwise clean up the premises. Liquors purchased in the saloon before 9:30 p. m. were delivered by appellant's servants and waiters in the cabaret, and those there to receive it and drink it on the premises, or carry it away, were entertained with music and the company of lewd women. All this was incident to and connected with appellant's liquor business, as shown by the evidence, and evidently provided by appellant and his associate Senchal for the purpose of promoting and increasing their sales of liquor. Senchal testified:

"The waiters in the café and rathskeller would go around to the customers who were eating and drinking and tell them that the bar would close at 9:25, and if they wished anything to drink that they would have to order it then. We didn't put any of the customers out of the place at 9:30. We allowed them to stay there and eat their lunches and drink their drinks, and drift out gradually."

The evidence clearly shows that the cabaret or rathskeller was kept open and business conducted therein after 9:30 p. m. according to standard time, on May 15, 1915, and if the statute has reference to that character of time, the acts of the appellant relied on by appellee as showing that appellant's place of business was kept open and business conducted in violation of the 9:30 closing law, occurred after 9:30 p. m. Appellant insists, however, that the statute must be construed as having reference to actual or sun time, and that so construed the acts relied on occurred before 9:30 o'clock. This question will be discussed later in this opinion.

[2] We also agree with the views of appellee, that the language of the statute, "house or place where the business of selling liquors under said license was conducted," does not mean simply the room or building in which the saloon of the liquor dealer is situated. The fair and reasonable construction of the statute is that it means any and all places, whether immediately connected with the barroom or detached therefrom, over which the seller of liquors has the right and does exercise authority and control, and which are used in connection with, or incident to, the business of selling liquors. No parallel case is cited, and we have found none, but the foregoing interpretation of the statute is sustained, we think, by the following authorities cited by appellee: Whitcomb v. State, 2 Tex. Civ. App. 301, 21 S. W. 976; Kitchens v. State, 44 Tex. Cr. R. 216, 70 S. W. 82; Humphrey's Texas Liquor Laws, p. 99; Cunningham v. Porchet, 23 Tex. Civ. App. 80, 56 S. W. 574; Horan v. Chief Justice, 27 Tex. 226; Adams v. State, 146 S. W. 1086; Munoz v. Brassel, 108 S. W. 417. The first case cited was an action on a liquor dealer's bond, for a breach of the condition of the bond that the dealer would keep a quiet and orderly house. It appears that in the back part of defendant's store there was a bar; that in the rear of the store a door opened upon an alley, across which there was an arbor; that defendant had control of this arbor, which was arranged with tables, at which persons drank beer purchased in the store, and the court held that the words, "house or place of business," included the arbor kept by defendant for the purpose of selling liquors, and that the judgment for plaintiff was proper if, in such place of business, defendant allowed music, boisterous talking, and indecent and vulgar language. In the second case the appellant was prosecuted for keeping a saloon open on election day in violation of the statute, and the Court of Criminal Appeals of this state, in holding that the evidence was sufficient to support the conviction, quoted with approval from Black on Intoxicating Liquors, § 393, the following language:

"Although that part of the house where the bar may be situated may not be open to the public, yet if other rooms in the house, connected with the barroom and habitually or occasionally used for drinking purposes are accessible to persons desiring liquor, such rooms are regarded as a part of the saloon, and while they are open the saloon is not closed as the law requires."

In Adams v. State, supra, a liquor dealer, who had given a bond conditioned upon his keeping a quiet and orderly house, or place for the sale of liquors, maintained a small inclosure behind and outside of his place of business, used for storing empty bottles and drunken customers, and this court held that

disturbances of the peace, committed in the inclosure, were a breach of the bond. The contention of the appellant in that case was that acts committed in the inclosure did not fall within the meaning of the statute, as the term "house" used therein meant the house wherein the liquor business was conducted. In rejecting this contention this court said:

"We think it means any part of the premises on which the business is conducted or used in connection with carrying on the same."

To practically the same effect are the other cases cited. It is quite clear that the liquors delivered to appellant's customers in the cabaret, to be drank there or carried away, were sold under the license revoked by appellee, and we think the evidence sufficient to show that the cabaret was a part of appellant's place of business and used in connection with the saloon conducted by him. The business consisted unquestionably of a saloon, cafè, and cabaret, or rathskeller. Liquors were commonly sold in the barroom for delivery in the cabaret or rathskeller, and, while not immediately connected, they were so situated with reference to each other and so provided with doors and a stairway as to make such deliveries convenient and in furtherance of the liquor business in which appellant was engaged. To hold that the cabaret, situated, equipped, and used as it was, did not constitute a part of appellant's place of business as designated in the license issued to him, would be, in effect, to suffer an evasion of the 9:30 closing law by a thinly veiled subterfuge, and leave its observance to only such persons, engaged in the retail liquor business in this state, as are disposed to obey it.

[3, 4] But appellant contends that actual or sun time should control in determining the hour at which appellant's place of business was closed on the evening in question, and that if it does, then the undisputed evidence shows that not only appellant's barroom and café were closed at 9:30 o'clock, but also the cabaret or rathskeller, and the judgment of the district court should be reversed, and judgment rendered in this court in favor of appellant. We are of opinion that this contention, in so far as reversing the judgment is concerned, should be sustained. The statute does not prescribe the character or kind of time which shall govern, and we know of no case in which it has been construed and the question determined. It has been definitely settled, however, by decisions of our Supreme Court and Court of Criminal Appeals, and likewise in courts of other jurisdictions where the question arose, that in determining the time of the expiration of a term of court limited by statute to a certain day, solar time, and not standard or railroad time, should be used, though the community has generally adopted standard time. Parker v. State, 35 Tex. Cr. R. 12, 29 S. W. 480, 790; Texas Tram & Lumber Co. v. Hightower, 100 Tex. 126, 96 S. W. 1071; 6 L. R. A. (N. S.) 1046, 123 Am. St. Rep. 794; Hen-

derson v. Reynolds, 84 Ga. 159, 10 S. E. 734, 7 L. R. A. 327; Searles v. Averhoff, 28 Neb. 668, 44 N. W. 872; American & Eng. Enc. of Law, vol. 26, p. 10. In the first case cited the appellant had been convicted of murder, and his punishment assessed at confinement in the penitentiary for life. He applied for a writ of habeas corpus on the ground that the verdict was rendered after the expiration of the term of court at which he was tried, and from an order denying the writ he appealed. It appeared that at the opening of the term of the court at which appellant was tried the court had the courthouse clock set by a sun dial which gave the true sun time and held the sessions of the term according to such clock. The Court of Criminal Appeals held that the hour at which the term of the trial court expired should be determined by the true sun time, and not by the standard time, and it appearing, according to the true sun time, that the verdict was received by the court before 12 o'clock at night on the last day of the term, affirmed the judgment of the trial court. In discussing the question, the court, speaking through Mr. Justice Henderson, among other things, said:

"True sun time is obtained by the means of a dial; mean sun time is what is called 'standard time.' What is known as simple 'standard time'—'central time'—is merely the solar time of the ninetieth meridian west of Greenwich. The difference between standard time and sun time is exactly the same over each meridian. What is called central time is used and extends between the ninetieth meridian running west to the one hundred fifth. There is a difference of 4 minutes for each degree between true sun time and standard or mean sun time."

The court then quotes from the American and English Encyclopedia of Law, cited above, the following:

"The only standard of time recognized by the courts is the meridian of the sun, and an arbitrary standard set up by persons in business will not be recognized."

Texas Tram & Lumber Co. v. Hightower, supra, was an original proceeding filed in the Supreme Court in which a writ of mandamus was prayed for to compel the judge of the Sixtieth judicial district of Texas to enter judgment upon a verdict alleged to have been returned into court at the April term of the trial court. It appeared that the verdict of the jury was returned into court on the last day of the term, 3 minutes past 12 o'clock by railroad time, but at least 15 minutes before 12 o'clock p. m. by sun time. The Supreme Court held that sun time governed in determining the expiration of the term of the court, and awarded the writ. In passing upon the question the Supreme Court, in part, said:

"We see no reason to doubt that when the Legislature prescribes the times at which a term of the court shall begin and shall end the true time at the place of holding the court is meant."

Likewise, this court can see no good reason to doubt that, when the Legislature prescribes the time at which saloons shall close

at night in this state, the true or sun time is meant.

"Certainly no reasonable objection can be urged against the recognition of sun time as the correct time by which matters of that character * * * should be regulated."

In the case before us the trial court, as shown by his conclusions filed, determined as a matter of law that the hour at which appellant's place of business should have been closed was controlled by standard time, and therefore, under the evidence, was kept open and business conducted therein after 9:30 o'clock p. m. on May 15, 1915. In this conclusion of the law we think the court erred. The evidence is insufficient to show that the rathskeller or cabaret run by appellant in connection with his saloon was open and business conducted therein after 9:30 o'clock p. m., true or sun time. The court in his conclusions of fact finds that the time when business was being conducted therein and the 9:30 closing law thereby violated was 9:45 p. m. standard time or railroad time. We take judicial cognizance of the fact that standard or railroad time at Dallas, Tex., is the actual or sun time along the ninetieth degree of longitude west from Greenwich; that city, where it is alleged the violation occurred, is approximately on longitude 96° 52' 30" west from Greenwich, and that there is a difference of 4 minutes in time for every degree of longitude. Therefore, according to sun time, and the evidence adduced, appellant's cabaret or rathskeller was not open and business being conducted therein after 9:30 o'clock p. m., and the judgment of the district court must be reversed.

[5] The contention of appellee that "appellant having failed to raise in the trial court, either by pleading or proof, the question here presented, as to the character of time by which the daily closing of Texas saloons is regulated, such question cannot be raised on appeal in this court, is not well taken. We are inclined to the opinion that appellant's pleadings, as well as the evidence, were sufficient to raise the question in the district court; but if not raised by the pleadings it was distinctly raised in appellant's motion for a new trial in that court. The appellant, in his petition filed in the district court, denied that his place of business was kept open and business conducted therein after 9:30 o'clock p. m. on May 15, 1915, and the character or kind of time which controlled was a question of law. Hence, regardless of whether the question was raised by the pleadings in the trial court, that court's ruling upon it is subject to review in this court.

We are asked to reverse the judgment of the district court and render judgment in this court in favor of appellant. This we have concluded not to do. The case was tried, and testimony offered on the theory that standard time, and not sun time, govern-

ed in determining the hour at which appellant's place of business should have been closed, and we are not prepared to say that the case has been fully developed, and that it would be useless to remand it for another trial.

Therefore, for the reason indicated, the judgment of the district court is reversed, and the cause remanded for a new trial.